RIKER & COMPANY, INC., Respondent, *v.* GEORGE R. ALBRIGHT and Others, Appellants.

First Department, January 26, 1940.

*Edward I. Devlin, Jr.,* of counsel [*Blake & Voorhees,* attorneys], for the appellants.

*Morris G. Duchin* of counsel [*Alexander Pfeiffer* with him on the brief; *Pfeiffer & Crames,* attorneys], for the respondent.

GLENNON, J.   This action was instituted to recover brokerage commissions in connection with the negotiation of two leases in which Childs Company was the lessee.   The premises known as 261 West Thirty-fourth street, New York city, were owned by the defendants George R. and Margaret Albright, whereas the property immediately adjoining and located at 263 was owned by the codefendant, Josephine K. Sheahan.   Each of these properties had constructed thereon, a separate and distinct four-story building.   The Albright property was incumbered with a mortgage in the sum of $50,000 which was held by the United States Trust Company.   The Sheahan property was subject to a mortgage of $75,000 held by the Bank for Savings.

In the early part of 1935 the Childs Company requested Stephen B. Haynes, a broker, to make a survey of a number of locations in the city of New York, with a view to the opening of new restaurants.   Among the places he suggested were the premises owned by the defendants.   He visited them and learned from the Albrights that they would be interested in renting their property on a long term lease, and he also ascertained from one William A. Blemly, who managed the Sheahan property, that it also could be rented for a term of years.   Other premises in various parts of the city were submitted also by him to Childs Company.   In June of that year Childs Company decided to let the matter of opening new restaurants rest in abeyance for the time being because of business conditions.   Shortly thereafter Haynes went on a business trip to Europe.   He returned to this country about December twentieth of the same year.

During the fall of that year Childs Company decided to go ahead with its expansion program.   One of its officers, in the month of October, requested the plaintiff, in the absence of Haynes, to continue with the survey.   The result was that one of the properties located at 735 Lexington avenue, which Haynes had submitted, was leased by the owner thereof to Childs Company and the plaintiff received its commission.   Haynes, however, made no claim for the services he had rendered in connection with that lease.

The plaintiff, prior to the return of Haynes, opened negotiations with the defendants for the lease of their properties.   While there is a dispute between the parties as to the amount of the original

offer, nevertheless, for our present purpose, we can adopt the figures as to the final offer which were submitted to the defendants on or about December 15, 1935, by one Samuel Kurcias, a salesman in the employ of the plaintiff. It should be noted here that Kurcias was the only representative of plaintiff who came in contact with either the defendants Albright or the agent of the defendant Sheahan. He said that about the middle of December, 1935, " I told Mr. Albright that Childs had gone over the building and had discussed it with their architects and so forth, and they would not pay any more than the rental of $7,500 for seven years, $8,000 for seven years, and $9,000 for seven years, providing Mr. Albright would erect a building there for their purpose, and they would fix up the interior to suit their business." In answer to the question, " What did Mr. Albright say in response? " he replied, " Mr. Albright said to me the rental is interesting and satisfactory, and as far as the erection of the building is concerned he would have to go to the institution with whom he had the present loan and see if he could get some additional money to make that improvement." Further he stated that he saw both Mr. Albright and the defendant Sheahan's agent almost every week between the middle of December, 1935, and the middle of January, 1936, and that the conversations between them were practically the same. He said: " I asked them what success they had with reference to getting that additional money for erecting the type of building Childs required, and they told me they were still waiting to hear from the institution, and I should come in to see them, or they would let me know. So I kept on going back to see them."

During the course of the cross-examination, Kurcias was asked the following question: " Q. Did you suggest going down to the bank, not only for the purpose of re-financing but finding out whether the bank would be satisfied with the proposition of tearing down the four-story building? A. I suggested they go down to the bank to see about the financing of it, because they told me they did not have the money." The president of the plaintiff, I. Jerome Riker, was cross-examined also as to the same subject-matter. He testified, " I was told by Mr. Kurcias that these owners said they did not have the money." That the defendants were telling the truth in that regard is evidenced by the fact that later it became necessary for Childs Company to advance money to them in order to pay up past due interest, taxes and moving expenses.

Thus it will be seen that the offer which the plaintiff submitted to the defendants on behalf of Childs Company was conditioned upon the willingness and ability of the defendants to demolish their buildings and erect in place thereof one new building covering both plots.

Shortly after the return of Haynes from Europe, in the early part of January, 1936, Childs Company directed him to renew his negotiations with the defendants. He did so. Concededly in the month of March, 1936, plaintiff, through its president, was requested by Grover C. Buck, a vice-president of Childs Company, to " turn over my papers and negotiations to a Mr. Haynes." The latter, subsequent thereto, after considerable work, finally brought the parties together on July 1, 1936. He first persuaded Childs Company to enter into a lease for a period of twenty-one years and pay an aggregate net rental of $182,000 plus four per cent of its gross receipts on both properties in excess of $260,000 per annum. Through his efforts Childs Company agreed to defray the expenses of demolishing the buildings which were on the premises and to erect in place thereof a new one-story building at a cost to Childs of not less than $40,000. In addition thereto, he persuaded the banks which held the mortgages to permit the owners to tear down the old buildings. After the leases were executed the defendants in good faith paid to Haynes the brokerage commission which he had earned.

The aggregate rental submitted by plaintiff for the twenty-one-year period amounted to $171,500 and, as we have seen, it would have been necessary for the defendants to defray the cost of demolition of the existing buildings and expend money out of their own pockets for the erection of a new one. There cannot be any question of the good faith on the part of the defendants since no contrary claim was advanced either in the complaint or the bill of particulars. Furthermore, as we have seen, the record shows that these defendants did not have the means to carry out the proposed tenant's demands even though they were willing to do so.

Under the circumstances here detailed, the plaintiff did not bring about a meeting of the minds of the Childs Company and the defendants. In *Sibbald* v. *Bethlehem Iron Co.* (83 N. Y. 378), Judge FRANCIS M. FINCH, referring to a broker, said: " The duty he undertakes, the obligation he assumes as a condition of his right to demand commissions, is to bring the buyer and seller to an agreement." Judge EDWARD R. FINCH in *Saum* v. *Capital Realty Development Corporation* (268 N. Y. 335) aptly expressed the same thought, in so far as it is applicable to leases, in the following language: " It sounds trite to reiterate that brokers' commissions are earned when they produce a customer ready, willing and able to comply with all the terms fixed by the lessor. A meeting of the minds is essential not only on the price but on all the other terms of the contract."

In submitting this case to the jury, the court in its charge said: " They say that after further efforts on both sides, finally Childs

& Company said they would pay for the first seven years $7,500, for the second seven years $8,000, and for the third seven years $9,000, and that they took those figures to the defendants and said, ' We have a tenant that will pay this amount, that tenant is Childs & Company, and wants to lease the property for those figures,' and the defendants said that was satisfactory.

" Now if that was what happened, then the plaintiff would be entitled to the commission because they then produced a tenant who was ready, willing and able to comply with the terms that the defendants had given them."

Inadvertently the court, after submitting the figures which covered the twenty-one-year rental period, failed to direct the attention of the jury to the fact that the Childs Company offer was submitted upon the condition that the defendants would demolish their buildings and erect in place thereof a new one. Had the jury been apprised of the correct offer on the part of plaintiff, undoubtedly it would have been constrained, on the evidence introduced, to bring in a verdict for the defendants. While the attention of the court was not directed to this error by the attorney for the defendants, still we feel impelled to say that we deem the error of such importance in this case that we would have granted a reversal of the judgment and have ordered a new trial for that reason, even though there were no other substantial errors in the record. However, we are inclined to the view that the complaint should have been dismissed since plaintiff failed to bring about a meeting of the minds of the parties on the agreements to lease.

Since the officers of Childs Company determined to have Haynes act as broker, after plaintiff had failed to bring about an agreement between the parties, it cannot be said that these defendants were guilty of bad faith. (*Sampson* v. *Ottinger*, 93 App. Div. 226.) There is no charge that the defendants conspired with the tenant to deprive the plaintiff of its commissions. The fact of the matter is that there is no evidence in the record to indicate that prior to the time of the execution of the leases, the representative of Childs Company and the defendants ever met. The defendants in good faith paid the commission to the broker who consummated the deal and consequently they should not be compelled to pay it to another.

For the reasons assigned, judgment should be reversed, with costs, and the complaint dismissed, with costs.

O'MALLEY, UNTERMYER, DORE and CALLAHAN, JJ., concur.

Judgment unanimously reversed, with costs, and complaint dismissed, with costs.